IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NICHOLA M. McGAHA,

        Plaintiff,

v.                                                    CIV 05-082 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

# MEMORANDUM OPINION AND ORDER

      In April 1998, Plaintiff Nichola McGaha filed for benefits and, following denial, took her first appeal to this Court. *See Administrative Record* (hereinafter "*Record*") at 69-71, 285-87; *McGaha v. Barnhart,* CIV 02-703 RLP. Magistrate Judge Puglisi remanded, finding that the ALJ Gerald R. Cole erred at Step 5 in relying solely on the grids, because substantial evidence did not support his conclusion that Plaintiff's nonexertional impairments had no effect on her ability to perform a full range of light work. *See McGaha v. Barnhart,* CIV 02-703 RLP (Doc. 16 at 10-11).

      After remand, the Appeals Council instructed that the ALJ to "provide the claimant an opportunity to appear at a hearing, develop the record . . . and issue a new decision." *Record* at 352. ALJ Gary L. Vanderhoof took the case after remand. He held a second hearing, called a vocational expert, and issued a decision that decided all matters anew. *See e.g., id.* at 303-310, 391. He too denied benefits at Step 5, finding that Plaintiff has the residual functional capacity for a "significant" range of light work. *Id.* at 310. He found that Plaintiff could perform work

involving "routine tasks in an average stress work environment," with the restrictions that she only "occasionally climb, crawl, crouch, kneel and bend," and that she not work at heights or in dangerous environments. *Id.* at 307. Noting that his finding of light work also determines that Plaintiff can do sedentary work, based on the vocational expert's testimony he identified five light and/or sedentary jobs she could perform – customer sales attendant, shipping and weighing attendant, clerk, charge account clerk, and jewelry sorter. *Id.* at 308. The Appeals Council declined review on December 20, 2004, thereby rendering the ALJ's decision final. *Id.* at 296.

This matter is before the court on Plaintiff's motion to reverse or remand, where she asserts that the ALJ committed three errors. *See Docs. 11, 12.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 3, 6.* The record has been read and carefully considered, and I find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

## I.  Factual Background

Plaintiff worked as a gas station attendant from age twenty to twenty-one, and as a truck driver thereafter. She was injured on the job in January 1994, when a "chain boomer" hit her in the face. She was twenty-four years old at the time of the accident. Initial x-rays did not show any fractures, but injections and medication did not relieve Plaintiff's pain. A subsequent CT scan did reveal a fracture and an entrapped nerve with a bone sliver impaling the nerve. In April 1994, she underwent surgery, but Plaintiff's pain continued. That Fall, she attended a college course to become trained as an "EMT." She completed the semester course but did not pursue a job in that area because she could not perform the required heavy lifting. *See, e.g., Record* at 34, 69, 84, 99, 115, 151, 219, 272-73, 393, 407-08.

By September 1994, surgeon Dr. Barry D. Nagel had referred Plaintiff to neurologist Dr. Jill M. Marjama-Lyons because of Plaintiff's facial pain, "seemingly not in the areas where I repaired her fractures," *id.* at 213, continued despite trials of several different medications, *see, e.g., id.* at 152, 210. Dr. Marjama diagnosed Plaintiff with "trigeminal neuralgia" and post-traumatic migraine headaches. *See, e.g., id.* at 150. She treated Plaintiff with various medications for over a year, and still Plaintiff did not report any improvement in her daily pain. *See id.* at 132-50.

Plaintiff and Dr. Marjama had discussed disability during this time. Dr. Marjama did not doubt that Plaintiff suffered from pain, but insisted that Plaintiff work and was "adamantly against this young lady being on disability." *Id.* at 136, *see also id.* at 136, 138, 141. She wanted Plaintiff "to return to work and perform work that would not require any significant physical activity." *Id.* at 138. In July 1995, Dr. Marjama wrote to the State of Arizona Workers Compensation claims department stating:

> I would prefer that [Plaintiff] does, indeed, work. She is able to sit without difficulty and should be able to perform desk work. It would be advisable to avoid any strenuous physical activity as noted before on the physical tolerance profile form.[1] It, indeed, is difficult for Nicola to concentrate and to work when she is experiencing severe pain from her headache.

*Id.* at 141. Plaintiff did not share Dr. Marjama's position regarding work:

> She is somewhat upset with me as I have indicated that I would like for her to return to work and perform work that would not require any significant physical activity. She states that it is difficult to even concentrate or perform any tasks due to the pain. We discussed today that I would not submit any requests for her to receive full disability and that she needs to pursue some type of work she feels

---

[1] The form to which Dr. Marjama refers is not part of the record.

> she is able to perform adequately. In my mind she is simply too
> young and too capable. I do understand that she has severe pain
> and I am hopeful that we will be able to limit her symptoms in the
> future.

*Id.* at 138.

Dr. Marjama also discussed with Plaintiff the possibility of trying alternative approaches to managing her pain, such as acupuncture and auto-hypnosis, but Plaintiff did not pursue these avenues. *See id.* at 136. By December 1995, however, Plaintiff was willing to consider "block" injections and, therefore, Dr. Marjama referred Plaintiff to Dr. Joan Lewis, a pain management specialist. *See id.* at 132, 194A.

Over the next six months, Dr. Marjama and Dr. Lewis both treated Plaintiff. Dr. Lewis prescribed opiates and administered a number of block injections. Although on the one hand Plaintiff reported that these therapies gave her relief from pain, on the other, she also consistently reported to her physicians that her pain was at a level of 8, 9, or 10 on a scale of 10, and that she was unable to work due to the pain as well as lack of offers. *See id.* at 128-31, 184, 186-88, 190-94. Nevertheless, Dr. Marjama still wanted Plaintiff to work, "with the modified disability as I have outlined to avoid lifting heavy objects and avoid heavy physical labor." *Id.* at 130.

Dr. Marjama and Dr. Lewis both wanted Plaintiff to go to counseling, but Plaintiff was "very resistant to any form of counseling [and] is still inclined to request full disability." *Id.*[2] As of May 22, 1996, Dr. Lewis informed Dr. Marjama that Plaintiff not "very receptive" to

---

[2] *See also id.* at 131 (2/20/96 – Plaintiff is "extremely resistant to any idea of counseling"); *id.* at 186 (4/3/96 – "tension, depression, and anxiety have been problem for her in exacerbating the pain as well as complicating her life; yet she has continued to refuse counseling [citing transportation and finances for transportation as the impediment]. The reasons for refusal appear sensible but I feel there is a need for counseling in this case to help with controlling her pain.").

counseling because she said she has "'no problems talking about my problems.'" *Id.* at 184. Dr. Lewis noted that Plaintiff "seems very resistant to actively involving herself in her recovery, I believe her emotional issues are an impediment and she continues to refuse counseling. She has reached maximal benefit for pain management unless she increased the medication and/or accepts counseling." *Id.*

By June 13, 1996, Dr. Marjama was one week away from giving birth. Her last medical record for Plaintiff notes that since she and Dr. Lewis did not think surgery was an option, and since Plaintiff had reached maximum benefit, there was nothing else Dr. Marjama could do for Plaintiff except recommend alternative therapies, which Plaintiff again refused. Dr. Marjama did fill out a Worker's Compensation form, however, and "suggest[ed] one additional modification that the patient should avoid bending as this tends to exacerbate her facial pain and headaches." *Id.* at 126. She also recommended that Plaintiff continue with Dr. Lewis. *Id.* at 127. Dr. Marjama never saw Plaintiff again, although Dr. Lewis continued to send reports to Dr. Marjama of her treatment of Plaintiff from July 1996 to January 1999.

In July 1996, Dr. Lewis changed Plaintiff's prescription from Methadone to MS Contin, *id.* at 183, but by August 1996, had become concerned because Plaintiff's "pain continued to increase despite medication and her continually increasing need for analgesics concerns me -- as this is not a typical picture." *Id.* at 181. She discussed referring Plaintiff for psychological counseling, which made Plaintiff angry, but Dr. Lewis told Plaintiff she would not prescribe another month's medication unless Plaintiff saw someone. *Id.* In September 1996, Plaintiff began to see "Dr. Hughes," a psychiatrist in her geographic location, but there are no medical records from him in the file and it is unclear how long or frequently she saw him. *Id.* at 182.; *see also id.*

at 180 (Dr. Lewis "read the report from Dr. Hughes"); *id.* at 179 (Plaintiff is "moderately satisfied with Dr. Hughes").

In May 1997, Dr. Nagel performed a second surgery and removed the plates from the first surgery. He found "[s]ignificant and massive scar tissue in an area left supraorbital nerve at area of foramen." *Id.* at 214. The second surgery did not help with Plaintiff's pain. *See id.* at 208, 209, 214.

In August 1997, Dr. Lewis again discussed the need for Plaintiff to have psychosocial support. At that visit she obtained Plaintiff's agreement to see psychologist Diana Calderon in conjunction with her visits to Dr. Lewis. *See id.* at 170. Plaintiff did not fully comply, however, and in December 1997, Dr. Lewis advised Plaintiff that she would not continue to treat her "unless she continues to see Dr. Calderon on a monthly basis." *Id.* at 167. Thereafter, some of Dr. Lewis' medical records note appointments with Dr. Calderon. *See id.* at 165-66, 245. While there are no appointment records from Dr. Calderon in the file, her two identical summary reports do suggest multiple appointments by Plaintiff, but do not mention the frequency of those visits. *See id.* at 268-271; *see also id.* at 398.

As before, throughout this entire 2½-year period of treatment by Dr. Lewis, Plaintiff reported relief from pain with various medications and injections (MS Contin, then Oxycodone, then Oxycontin). On the other hand, however, Plaintiff also reported that her pain was unremitting and remained in the 8 to 10 range. *See id.* at 162-63, 165-83, 231-34, 245; *see also id.* at 208, 209, 214. In March 1998, according to Dr. Lewis, Plaintiff was "advised that she discontinue her medications by tapering down and see if she can be withdrawn from disability." *Id.* at 245. The entity or person who so advised Plaintiff is unclear from Dr. Lewis's notes. In

fact, Dr. Lewis disagreed with that approach and believed that Plaintiff should "be maintained on this medication and continue with psychological support. I do feel that psychological support is a significant portion of her therapeutic regimen and have discussed this with her." *Id.* The following month, Plaintiff applied for benefits. *See id.* at 69-71, 285-87.

Plaintiff continued to see Dr. Lewis and to take the Oxycontin through January 1999. She stopped seeing Dr. Lewis and Dr. Calderon after that time because, according to Plaintiff, the Arizona Worker's Compensation system would not continue to pay for the medication and counseling therapies because they was not helping. *See id.* at 38-39, 273, 397-98. In the Summer of 1999, Plaintiff settled her Worker's Compensation claim, stipulating that she is able to work twenty hours a week. She was awarded a permanent partial disability. *Record* at 122-24.

Plaintiff's next medical records begin over a year after she stopped seeing Dr. Lewis. From March 2000 to June 2002, Plaintiff saw Dr. Sylvia Montoya, apparently a general practitioner, six times. *See id.* at 371-88. Only one of those visits, June 2001, was for a headache that lasted three days. *See id.* at 378. The rest of the visits did not mention headaches as the primary complaint, but rather conditions such as "sinus infection, HA [headache], sore throat x 5d," *id.* at 374; a corneal abrasion, *id.* at 375-76; congestion, cough and loss of voice, *id.* at 379-80; cough, fever, and vomiting, *id.* at 381; and joint pain, *id.* at 384. None of the records mention complaints of face pain.

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005); *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th

Cir. 2005); *Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004)  My assessment is based on a "meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Grogan,* 399 F.3d at 1262; *Langley,* 373 F.3d at 1118; *Hamlin,* 365 F.3d at 1214.

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Grogan,* 399 F.3d at 1261; *Hackett,* 395 F.3d 1172; *Hamlin,* 365 F.3d at 1214.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record of if there is a mere scintilla of evidence supporting it." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Grogan,* 399 F.3d at 1262; *Hamlin,* 365 F.3d at 1214.

## III.  Analysis

Plaintiff contends that the ALJ erred at Step 4 in his credibility and residual functional capacity findings and erred at Step 5 by not submitting all of Plaintiff's impairments in his hypothetical questions to the vocational expert.

### *A.  Credibility*

In her written submissions and testimony, Plaintiff asserted that she cannot work because she has never been completely pain-free either from the facial pain or from migraines.  She further maintains that her migraines occur two to three times a month and leave her incapacitated anywhere from three to seven days, and sometimes ten days in an extreme case.  *See Record* at 88, 394-406.  When Plaintiff experiences a migraine, she lies down, sits, or wanders, unable to concentrate on anything.  *Id.* at 404.  Plaintiff cannot lift heavy objects, bend over, climb stairs,

engage in strenuous activity, or be exposed to stress, bright lights, and loud noises. These things either trigger or exacerbate facial pain and/or migraine headaches. *See id.* at 80, 87, 95, 106.

Plaintiff was, however, required to work to maintain her Worker's Compensation benefits. From late 1996 to 2000, she traveled six months out of the year with her trucker common-law husband, doing his paperwork. She worked part-time at her mother's sawmill in 1999 and 2000, but was permitted to miss work whenever she had a migraine. She worked full-time for eight months at a veterinary office in 2002, but she quit the job due to stress. While she was working at the veterinary office, she was also working part-time at a friend's feed store and continued there on a part-time basis. The friend also permitted her to miss work whenever necessary. *See id.* at 29-30, 32, 399-405.

ALJ Vanderhoof concluded that "the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision," *id.* at 309, and those reasons are as follows:

> The undersigned must determine whether [Plaintiff] retains the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 CFR §§ 404.1545 and 416.95 and Social Security Ruling 96-8p).
>
> In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p. The undersigned must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and

resulting limitations (20 CFR §§ 404/1527 and 416.927 and Social Security Rulings 96-2p and 96-6p).

The claimant affirmed her previous testimony that she did work with her husband, riding with him six months out of each year while he drove a truck. She also worked for her mother doing book work on a part-time basis. She testified that she now works two days a week, eight hours a day, at a feed store. She testified that the people who own the store [are] family friends, who allow her to miss work when necessary. She testified that she continues to get migraines two to three times a month, requiring her to lie down. She testified that these symptoms last for three to seven days. However, her recent treatment for these complaints has been quite minimal. She last saw a doctor for these complaints in June of 2001, when she complained of a headache that lasted for three days (Exhibit 11F/8). Prior to that she last sought pain management treatment in May 1998 (Exhibit 4F/18). The claimant refused counseling, despite referrals from her treating physicians (Exhibits 1F/2 and 2F/30). Eventually, she did begin seeing a psychiatrist (Exhibit 2F/25). She was also referred to UNM hospital for treatment, after her workers compensation ran out, but claimed that the distance was too far, even though her other doctors were also in Albuquerque. She is able to walk daily for exercise (Exhibit 2F/23). She is able to care for her daughter and her 50(sic)-year-old brother, as well as her mother's property which has for (sic) trees (Exhibit 9F). Testing showed that she had no significant memory difficulties, but for (sic) performed tasks at a somewhat slow pace (Exhibit 9F). This impairment was classified as mild. Her main difficulties were with sustained attention to complex tasks, but her overall functioning was still quite good, according to the evaluation (Exhibit 9F). She currently takes Lorcet and MaxaH for her headaches. She also borrows Imitrex from a friend (Exhibit 14E). She does not complain of side effects. She was previously tapered off of all analgesics, due to lack of financial coverage (Exhibit 4F/6). She was able to perform work commensurate with substantial gainful activity in 2002. Her impairments have not increased since that time, and have remained essentially stable since her injury in 1994. Thus, the claimant has proved herself capable of performing sustained work activity in a competitive employment environment, ***despite her pain and limitations.***

The claimant received a 15% impairment rating from the workers compensation administration for her injuries (Exhibit 9F). This

10

does not establish an inability to perform substantial gainful activity.

    Her treating neurologist indicated that the claimant was able to sit without difficulty and should be able to perform desk work. He (sic) advised her to work in July 1995 (Exhibit 1F/20). However, he (sic) did state that she should avoid strenuous physical activity or acute concentration (Exhibit 1F/20). In August 1995 he (sic) continued to state that the claimant was simply too young and too capable to be considered disabled (Exhibit 1F/14).

    Accordingly, the undersigned finds the claimant retains the following residual functional capacity. . . .

*Record* at 306-07 (emphasis added).

### 1. Sufficiency of ALJ Vanderhoof's Discussion

Plaintiff asserts that ALJ Vanderhoof's decision "does not set out a credibility analysis," and this alone constitutes reversible error because this Court would be "required to pull the analysis out of the many paragraphs of unorganized discussion." *Doc. 12* at 13. She cites *Hardman v. Barnhart,* 362 F.3d 676 (10th Cir. 2004) in support of reversal for this reason where it stated: "As is the risk with boilerplate language, we are unable to determine in this case the specific evidence that let the ALJ to reject claimant's testimony." *Id.* at 679.

It is true that in the Tenth Circuit, "boilerplate" language which recounts the applicable standard of review as a finding will not suffice. *Id.* A lack of analysis on the part of an ALJ "is troubling [because the Tenth Circuit has] urged ALJs to include reasoning in their decisions to make appellate review not only possible but meaningful," *Howard v. Barnhnart,* 379 F.3d 945 947 (10th Cir. 2004).

Here, however, ALJ Vanderhoof's conclusion about credibility specifically refers back to his prior discussion in the body of the opinion. That discussion references the applicable

standards as the starting point and further discusses all the evidence he relies upon in reaching his conclusion in some detail. As such, his analysis is not "boilerplate" such as that condemned *Hardman,* and I find no error in this regard. Even if it is possible to characterize the ALJ's discussion as "com[ing] close to transgressing [the] decisions prohibiting the use of boilerplate language to support credibility determinations," the "basic thrust of the ALJ's analysis" is readily apparent in the above excerpt and is therefore sufficient to allow meaningful appellate review. *Rhodes v. Barnhart,* 117 Fed. Appx. 622, 629 (10th Cir. 2004).

### 2. ALJ Did Not Disbelieve That Plaintiff Suffers From Pain

Plaintiff contends that despite the fact that Plaintiff's doctors believed she suffered pain and prescribed narcotics, and despite Plaintiff's testimony concerning work limitations due to pain, *id.* at 14, ALJ Vanderhoof "offered no specific, legitimate reasons for ***disbelieving*** Ms. McGahas's complaints of pain," *Doc. 12* at 15 (emphasis added).

ALJ Vanderhoof started his opinion with a detailed discussing of Plaintiff's medical records, which establish impairments either defined as pain itself or as a condition that is pain producing. *See Record* at 305; *see also, e.g., Branum v. Barnhart,* 385 F.3d 1268, 1273 (10th Cir. 2004) (discussion of first two prongs of *Luna* inquiry). The emphasized language above – "despite her pain" – coupled with his discussion of her medical evidence, shows that the ALJ ***did*** believe Plaintiff suffers from pain and the pain impacts her work abilities. *See Qantu v. Barnhart,* 72 Fed. Appx. 807, 811 (10th Cir. 2003) ("it is clear from the ALJ's decision that she accepted that claimant suffered some pain, but found that her pain was not disabling").

But, "a claimant's inability to work pain-free, standing alone, is not a sufficient reason to find her disabled." *Id.* (citing *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)). Instead,

"disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude *any* substantial gainful employment." *Gossett,* 862 F.2d at 807 (internal quotations and citations omitted; emphasis added).

ALJ Vanderhoof focused on the final prong of the *Luna* test, which is "whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." *Branum,* 385 F.3d at 1273 (internal quotations and citations omitted). Moreover, his opinion covers the relevant factors in determining the credibility of pain testimony. *Id.* (such as levels of medication, effectiveness of medication, attempts to obtain relief, frequency of medical contacts, nature of daily activities). Thus, I do not read the opinion as "disbelieving" Plaintiff suffers pain or that the ALJ employed an incorrect legal standard.

### B. Residual Functional Capacity

**1. Re: Migraines**

Plaintiff's second assertion of error is related to her credibility arguments. She maintains that ALJ Vanderhoof erred in failing to credit her claim that migraines would keep her from working from three to ten days of work per month. Had this nonexertional limitation been included in his residual functional capacity findings, the vocational expert was of the opinion Plaintiff could not miss that much work and remain employed. *See Doc. 12* at 6-13; *see also Record* at 413-15.

Specifically, Plaintiff takes issue with the portion of the ALJ's opinion where he stated:

> She testified that she continues to get migraines two to three times
> a month, requiring her to lie down.   She testified that these
> symptoms last for three to seven days. However, ***her recent***

13

> ***treatment for these complaints has been quite minimal.  She last saw a doctor for these complaints in June of 2001, when she complained of a headache that lasted for three days (Exhibit 11F/8).***  Prior to that she last sought pain management treatment in May 1998 (Exhibit 4F/18).

*Record* at 306 (emphasis added); *see also Doc. 12* at 11.

I first note that Plaintiff lists thirty-seven doctors' visits from August 1995 to June 2002 and characterizes all of them as seeking treatment for "headaches."  However, the focus of her assignment of error is her migraines, not her facial pain.  My review of all of Plaintiff's medical records shows that her complaints about migraines to doctors were less frequent following the first year after the accident, and her description of the migraines' intensity and frequency lessened thereafter over the some three-year-treatment period with Dr. Marjama and/or Dr. Lewis.

In any event, Plaintiff's argues that the highlighted language above earmarking June 2001 as the last complaint about a migraine is unsupported because she saw Dr. Montoya in June 2002 for a "headache."  It is clear from that medical record, however, that the "headache" was not a migraine, but one of the various symptoms she described in conjunction with a sinus infection which was diagnosed as "pharangitis/bronchitis" and "asthma."  *See Record* at 374.

Plaintiff also cites her testimony that she presently "needs" to see Dr. Marjama but cannot because Workers Compensation will not pay for the doctor visit.  *See Doc. 12* at 11; *Record* at 394.  Yet she fails to explain how this accounts for her lack of complaints about migraines to Dr. Montoya.  Furthermore, she does not take issue with the ALJ's observation that Plaintiff's form for recent medications provides that Dr. Montoya apparently has continued to prescribe hydrocodone ("Lorcet") and also prescribes "Maxalt" for "headaches;" and Plaintiff borrows

Imitrex from a friend for migraines.[3]  *See Record* at 360.  Finally, Plaintiff testified that she sees a massage therapist and "that seems to help alleviate a lot of the tension the migraines bring on." *Id.* at 406.

I thus find no error in the ALJ's analysis regarding the migraines based on Plaintiff's above arguments.

### 2.  Re:  Mental Capacity And Stress Alone And/Or Impacting Migraines

Plaintiff asserts the GAF scores of 50 "is evidence of serious symptoms indicating problems keeping a job." *Doc. 12* at 12.  It is settled, however, that the GAF score is not conclusive on this point, because the scores can indicate problems entirely unrelated to the ability to hold a job.[4]

---

[3] Plaintiff indicates that Dr. Montoya prescribes Lorcet, which is hydrocodone and acetaminophen.  *See* www.medicinenet.com/hydrocodoneacetaminophen/article.htm ("GENERIC NAME: hydrocodone/acetaminophen.  BRAND NAMES: Vicodin, Vicodin ES, Anexsia, **Lorcet,** Lorcet Plus, Norco.") (emphasis added).  I did not find a reference to "MaxaH," but "Maxalt" which is a "medication used to treat acute migraine attacks." *See id*. (/rizatriptan_tablet-oral/article.htm).  Imitrex also is a drug used to relieve migraine pain.  *See id.* (/sumatriptan/article.htm).

[4] *E.g., Zachary v. Barnhart,* 94 Fed. Appx. 817, 819 (10th Cir. 2004) ("A GAF of 45 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning.' AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).  Dr. Mynatt's finding that Ms. Zachary's present level of functioning was 45 did not include any explanation for giving her that rating and did not indicate that Ms. Zachary was unable to work.  Ms. Zachary's GAF score of 45 may indicate problems not necessarily related to her ability to hold a job, *see id.,* and therefore standing alone, without any further narrative explanation, this rating does not support an impairment seriously interfering with her ability to work."); *Cainglit v. Barnhart,* 85 Fed. Appx. 71, 75 (10th Cir. 2003) ("A GAF score of 41-50 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning,' while a GAF score of 31-40 indicates '[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood.' . . . A GAF score of 39-45 thus may indicate problems that do not necessarily relate to one's ability to work. . . . In this case neither Dr. Ball nor the MHSSO counselors stated that Ms. Cainglit's depression would interfere with her ability to work. . . . Rather, they noted problems with her family and social relationships. . . . In the absence of any evidence indicating that Dr. Ball or the MHSSO assigned these GAF scores because they perceived an impairment in Ms. Cainglit's ability to work, the scores, standing alone, do not establish an impairment seriously interfering with Ms.

Both psychological sources noted that Plaintiff had some attention and concentration difficulties, and Plaintiff argues that the ALJ's "only acknowledgment of these impairments appears to be his inclusion" of limitation on stress. *Doc. 12* at 12-13. But neither of these psychological sources found her difficulties disabling. Dr. Calderon apparently thought Plaintiff should not go back to truck driving, but did not mention any specific work-related limitations *E.g., Record* at 271 ("[Plaintiff] continues to entertain thoughts of the possibility of resuming some of her previous job responsibilities. However, due to her plain level and the extreme fluctuation she experiences, altered goals/plans should be evaluated."). The consulting psychologist administered testes that showed Plaintiff is "in the mild impairment classification. Thus some problems with sustained attention to complex tasks resulting slower than the average functioning but the quality of her functioning is still quite good." *Id.* at 275. In response to her comment that she "'used to be sharp as a tack,'" his personal observation of her during the interview as that Plaintiff "still is pretty sharp" *Id.* at 273.

ALJ Vandherhoof specifically discussed and incorporated the problems with attention and concentration in his residual functional capacity finding by restricting Plaintiff to "routine" work. *See Record* at 307; *id.* at 411, 413, 415.

Plaintiff asserted that she is limited in her ability to deal with stress because stress either triggers or exacerbates headaches. For example, she had to quit working at the veterinary office after eight months because of the "extreme amount of stress" caused by dealing with animals and people at the same time. *See Record* at 87, 402-03. ALJ Vanderhoof again incorporated Plaintiff's "stress" limitation into his residual functional capacity finding – "she is able to perform

---

Cainglit's ability to perform basic work activities.").

16

routine tasks in an average stress work environment." *See id.* at 307; *see also id.* at 411-12 ("And the work would be of a fairly routine and a non-high-stress nature. I don't want any high-stress work, you know, average pace only.").

Plaintiff faults ALJ Vanderhoof for "implicitly" concluding that elimination of stress would alleviate Plaintiff's headaches, as well as for not determining "how the day-to-day work related activities would affect [Plaintiff's] headaches" *See id.* at 13. I fail to see how the ALJ erred in this regard when Plaintiff did work, was the one who maintained that it is stress which triggers or exacerbates her headaches, and the ALJ in fact incorporated her stress limitation into his residual functional capacity finding. *Compare Ash v. Sullivan,* 748 F. Supp. 804, 809 (D. Kan. 1990) ("The ALJ's conclusion that the elimination of stressful work should greatly alleviate the plaintiff's headaches . . . finds no support in the record. The evidence indicates that plaintiff suffers severe migraines on a regular basis even though she is not employed. There is no evidence in the record to support the conclusion that the elimination of stress in general or stressful work in particular would alleviate her headaches.").

The other cases Plaintiff cites are also inapposite. In *Ortega,* the ALJ found Plaintiff's migraine "pain" not credible because there were no "laboratory tests" so showing, but treating physician records documented the symptoms and that doctor was of the opinion the claimant was disabled. *Ortega v. Chater,* 933 F. Supp. 1071, 1076 (S.D. Fla. 1996). Here none of Plaintiff's treating sources indicated that she could not work. Indeed, Dr. Marjama was "adamant" to the contrary. Clearly ALJ Vanderhoof did not discount Plaintiff's assertions of pain.

Likewise, in *Lancellotta,* the ALJ erred in concluding that at a claimant who suffered from a "severe mental impairment" could do nonstressful work without evaluating his ability to "understand, carry out, and remember simple instructions; to respond appropriately to

supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Lancellotta v. Secretary of Health & Human Servs,* 806 F.2d 284, 285 (1st Cir. 1986).

> In *Lancellotta,* three physicians determined that the claimant was 'totally incapacitated as a result of anxiety.' . . . There was evidence in the record indicating that the claimant in that case, who had suffered a head injury, experienced dizziness, ringing in his ears, severe anxiety, fatigue, stomach distress, shortness of breath, and ventricular irregularity, feared going outside, and was incapable of driving. In contrast, no doctor found plaintiff to be disabled and no treating physician found her to be totally incapacitated by stress or anxiety. Unlike the claimant in *Lancellotta,* there is no evidence in the record demonstrating her stress and anxiety preclude her from all employment.

*Dowty v. Barnhart,* 68 Fed. Appx. 953, 955 (10th Cir. 2003). The case at bar presents the same situation as *Dowty*, and I therefore find this assignment of error without merit.

### *B. Hypothetical To Vocational Expert*

Plaintiff asserts that ALJ Vanderhoof's hypothetical to the vocation expert failed to include Dr. Marjama's "bending" restriction. *Doc. 12* at 4-5. The word "bend" does appear in the ALJ's written opinion as a restriction. See Record at 307 ("occasionally climb, crawl, crouch, kneel and bend."). As Plaintiff notes, the ALJ did not use the word "bend" when posing hypotheticals to the vocational expert. Instead, the precise words he used were: "[o]ccasionally climb, balance, stoop, kneel, crouch, and crawl." *Record* at 411.

I do not find the omission of the word "bend" to constitute error. "Although the ALJ did not use the specific words, 'bend and stoop,' the question did supply restrictions of occasional kneeling and crawling. Social Security Ruling 85-15 treats bending and stooping synonymously with kneeling and crawling." *Chamberlain v. Shalala,* 47 F.3d 1489, 1495 (8th Cir. 1995). As that regulation provides:

> Stooping, kneeling, crouching, and crawling are progressively more

>    strenuous forms of bending parts of the body, with crawling as a
>    form of locomotion involving bending. Some stooping (bending the
>    body downward and forward by bending the spine at the waist) is
>    required to do almost any kind of work, particularly when objects
>    below the waist are involved. If a person can stoop occasionally
>    (from very little up to one-third of the time) in order to lift objects,
>    the sedentary and light occupational base is virtually intact.
>    However, because of the lifting required for most medium, heavy,
>    and very heavy jobs, a person must be able to stoop frequently
>    (from one-third to two-thirds of the time); inability to do so would
>    substantially affect the more strenuous portion of the occupational
>    base. This is also true for crouching (bending the body downward
>    and forward by bending both the legs and spine). However,
>    crawling on hands and knees and feet is a relatively rare activity
>    even in arduous work, and limitations on the ability to crawl would
>    be of little significance in the broad world of work. This is also true
>    of kneeling (bending the legs at the knees to come to rest on one or
>    both knees.

*Social Security Ruling 85-15,* 1985 WL 56857 at * 7.

   Wherefore,

   **IT IS HEREBY ORDERED** that Plaintiff's motion (Doc. 11) is DENIED, and the

decision of the Commissioner is affirmed. A final order will enter concurrently herewith.

                                              _____
                                              UNITED STATES MAGISTRATE JUDGE
                                              Presiding by consent.